IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

BRANDI K. KAISER,                    )
                                     )
               Plaintiff,            )
                                     )
       v.                            )          Case No.
                                     )          04-3510-CV-S-REL-SSA
JO ANNE BARNHART,                    )
Commissioner of Social Security,     )
                                     )
               Defendant.            )

**ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Brandi Kaiser seeks review of the final decision of the

Commissioner of Social Security denying plaintiff's application for a

period of disability and disability insurance benefits under Title XVI of

the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in

(1) not giving controlling weight to the opinions of treating psychologist,

Dr. McKenna, (2) failing to provide a proper residual functional capacity

based on all of the evidence in the record, (3) failing to define terms in

the hypothetical to the vocational expert resulting in speculation, and (4)

failing to conduct a proper credibility analysis.  I find that the ALJ erred

in finding plaintiff not credible, the ALJ erred in discrediting the opinion

of Dr. McKenna, and the ALJ erred in finding plaintiff not disabled.

Therefore, plaintiff's motion for summary judgment will be granted and the decision of the Commissioner will be reversed.

## I.    *BACKGROUND*

On December 20, 2002,  plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since April 1, 1994.  Plaintiff's disability stems from mood disorders and organic mental disorders.  Plaintiff's application was denied on February 11, 2003.  On April 6, 2004, a hearing was held before an Administrative Law Judge.  On July 23, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On September 10, 2004, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is

2

supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-

3

determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

  1.    Is the claimant performing substantial gainful activity?

              Yes = not disabled.
              No = go to next step.

  2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

              No = not disabled.
              Yes = go to next step.

4

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff; her husband, Chris Thompson; and vocational expert Terri Crawford, in addition to documentary evidence admitted at the hearing.

### A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Plaintiff, who was born in 1983, is currently 21 years of age.  Her earnings record shows the following earned income:

| Year | Earnings | Employer |
|------|----------|----------|
| 2000 | $2,695.39 | C&S Marshfield, Inc. (McDonalds) |
|      | 347.88   | M&M Pizza |

5

|      |          |                        |
|------|----------|------------------------|
| 2001 | $0.00    |                        |
| 2002 | $840.57  | Tiny's Steak Ranch, Inc. |
| 2003 | $0.00    |                        |
| 2004 | $0.00    |                        |

(Tr. at 45-46, 64).

**School Records**

Plaintiff's high school records show that she received the following below-average grades:

| | | | |
|---|---|---|---|
| Physical Science | D- | English | F |
| Physical Science | D- | Psychology | D+ |
| Biology I | D+ | English II | D |
| Applied Math | D+ | English II | F |
| American History | D- | FACS | F |
| Chemistry | D | Art | D |
| English II | D+ | | |

(Tr. at 82-83). Plaintiff was in special education math classes because she was found to have a learning disability in math (Tr. at 84, 87). She was found to have a speech/language disorder in receptive/expressive language (Tr. at 86, 87).

During testing, it was determined that plaintiff's receptive language skills were delayed approximately two years and eight months (Tr. at 101). Her expressive language skills were delayed approximately five years (Tr. at 101). "These delays could affect her ability to understand concepts presented by her classroom teachers." (Tr. at 101). Her IQ

6

scores – verbal, performance, and full scale – were all in the low average range (Tr. at 101).

Plaintiff was noted to like creative writing assignments (Tr at 104). She attended the learning disabled classroom for mathematics reasoning and calculation (Tr. at 104)  The learning disabled teacher reported that plaintiff "needs much repetition when introduced a new skill." (Tr. at 104).

Plaintiff was observed reading silently on tests, then reading louder and louder as the reading became more difficult for her (Tr. at 104).  She became excited during one test which included fraction problems, stating, "I know how to do that!" (Tr. at 104).  Plaintiff stated on multiple occasions that she planned to go to college to become a nurse or a veterinarian (Tr. at 91, 107).

**B.    *SUMMARY OF MEDICAL RECORDS***

*Lakeland Regional Hospital.*  On February 26, 2001, plaintiff was admitted to Lakeland Regional Hospital under the care of Richard Christy, M.D. (Tr. at 132-133).  She was discharged on March 9, 2001, after undergoing therapy.  During her hospitalization, plaintiff was monitored for purging behavior.  Upon discharge, Dr. Christy noted that plaintiff was demonstrating potential for self harm, potential for violence towards others and potential for elopement [leaving the hospital].  When

7

discharged, plaintiff appeared depressed and quite sad at times. She had very little trust in anyone and reported that she felt misunderstood. She was diagnosed with major depression, recurrent, and assigned a global assessment of functioning ("GAF") of 25[1]. She was told to follow up with the Marian Center for medication control.

On February 26, 2001, plaintiff underwent a psychological evaluation at Lakeland Regional Hospital (Tr. at 134-136). J. D. Forsyth, Psy.D., administered the Peabody Picture Vocabulary Test Revised[2]; Wide Range Achievement Test - II[3]; Minnesota Multiphasic Personality Inventory[4]; Incomplete Sentences[5]; House-Tree-Person[6]; Kinetic Family

---

[1]Behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

[2]The test-taker is shown four black-and-white illustrations arranged on a page called a Picture Plate. The task is for the test-taker to select the picture that best represents the meaning of the stimulus word presented orally by the examiner. The test provides a means of measuring linguistic potential for individuals with language impairments.

[3]Helps to identify disabilities in reading, spelling, and arithmetic skills. The test involves the following: reading--recognizing and naming letters, pronouncing printed words; spelling--writing names, writing letters and words from dictation; arithmetic--counting, reading number symbols, oral problem computations.

[4]Used by clinicians to assist with the diagnosis of mental disorders and the selection of appropriate treatment methods. The MMPI consists

Drawing[7]; and performed a clinical interview and medical record review.

Plaintiff reported feeling helpless, hopeless, and worthless. She noted feeling suicidal and acknowledged that she made superficial marks on her wrists from self-mutilation. She noted fluctuating moods, poor appetite, feeling tired all the time, having difficulty with her peer group, and feeling overwhelmed. She reported that she did not deserve to be alive.

_____

of 550 descriptive statements which are to be answered with "true", "false" or "cannot say," depending on whether the patient believes it applies to him or her, or not. The patient's responses are scored across 14 basic scales. These statistical scales measure personality dimensions such as one's proneness to hypochondria, or pessimism; level of sociability; interpersonal assertiveness; degree of femininity and masculinity, etc.

[5]The Incomplete Sentences Test contains sixty items, consisting of the first few words of sentences which the respondent is asked to complete on the basis of one's feelings. An objective scoring mechanism is provided which yields a numerical score between 0 and 100. The test measures job commitment, communication skills, interpersonal skills, positive attitude, problem solving ability, and self confidence.

[6]The person is told to draw a house, a tree, and a person, and then is asked questions about each drawing. The answers to those questions and how the person draws the objects tells the examiner things about the person's personality.

[7]The person is told to draw a picture of everyone in his or her family doing something. The way in which family members are drawn, along with other features of the drawing, provides the tester with information about the person's feelings, perception, and family relationships.

9

Dr. Forsyth noted that plaintiff was very sullen and self-critical. He noted that insight and judgment were poor. Tests revealed that plaintiff had an IQ of 80, resulting in an age equivalency of a twelve-year-old. She had a low average range of intellectual efficiency and a sixth-grade achievement level on arithmetic. Results of the MMPI-A revealed that plaintiff was having significant problems and making a plea for help.

Dr. Forsyth noted that plaintiff had unrealistic thoughts about death and losses in her life. She suffered from significant depressive symptoms and may have lacked adequate resources to function beyond a marginally adaptive level. Dr. Forsyth reported that plaintiff's emotional stressors may have turned into physical complaints. She had difficulty with authority figures, would avoid social situations, and was at risk for addictive behaviors. Plaintiff was ultimately diagnosed with major depressive disorder with suicidal ideation - rule out psychotic features, bereavement, and anxiety disorder not otherwise specified, with agoraphobic and post traumatic stress disorder. Plaintiff was again assigned a GAF of 25[8].

---

[8]Behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

Case 6:04-cv-03510-REL   Document 15   Filed 10/28/05   Page 10 of 37

Plaintiff was readmitted to Lakeland Regional Hospital on March 26, 2001, due to a suicide attempt in which plaintiff attempted to cut her wrists after having a conversation with her father (Tr. at 130-131). The previous week, plaintiff had also reported that she would be better off dead. Dr. Christy observed that plaintiff appeared depressed and lethargic. Plaintiff was again diagnosed with major depression, recurrent, and was assigned a GAF of 25.

On the same date, Jess Lyon, D.O., performed a physical examination upon admission. Dr. Lyon noted that plaintiff had tried to slash her wrist with a piece of glass and noted that when plaintiff reported she did it, she said she felt no pain but actually felt better (Tr. at 127). Plaintiff also noted some abdominal cramping especially when she ate foods containing lactose.

On April 4, 2001, plaintiff was discharged from the hospital (Tr. at 125). Dr. Christy reported that plaintiff's therapists observed that she was very mean when she talked to herself; she heard statements in her head that she was worthless; she was tearful, withdrawn and irritable. The treatment team continued to feel that plaintiff was very distressed. She was discharged, however, after denying thoughts, plans, or intentions of wanting to harm herself.

11

**Richard Christy, M.D.**  Richard Christy, M.D., continued to treat plaintiff after she was discharged from Lakeland Regional Hospital.  On May 23, 2001, Dr. Christy noted that plaintiff was sleeping too much during the day and was binging and purging (Tr. at 162).  Dr. Christy noted that plaintiff was in a better mood and was calmer than in the last session.  He again diagnosed plaintiff with major depression.

When plaintiff returned on June 27, 2001, she reported that she was sleeping okay and was not as depressed as previously (Tr. at 159).  Dr. Christy noted that plaintiff seemed a bit more optimistic than previously and she was reluctant to discuss her binge/purge habit of eating.

Plaintiff returned on May 9, 2002, and reported that she had taken herself off of her medication and that her condition had gone down hill (Tr. at 155).  She noted that she was quite moody and was having difficulties with her work and school.  Dr. Christy renewed her prescriptions for Depakote[9] and Celexa[10].

**Tri-County Psychological services.**  Ward Lawson, Ph.D., started in-home therapy with plaintiff in March 2002 (Tr. at 166-176).  Dr.

---

[9]Used to control mania associated with bipolar disorder.

[10]A selective serotonin reuptake inhibitor used to treat depression.

12

Lawson performed therapy once a week to help plaintiff deal with daily problems. On May 14, 2003, Dr. Lawson noted that plaintiff was drowsy after starting her medication again. On September 25, 2005, plaintiff reported that her psychiatrist said she no longer needed counseling.

On April 20, 2002, Dr. Lawson performed a psychological evaluation (Tr. at 163-165). He noted that plaintiff's father was an active drug user and schizophrenic who abused plaintiff and her mother. She also reported that she was afraid to obtain her driver's license. Dr. Lawson administered the MMPI-A, Sentence Completion Tests, Draw-A-Person, Peabody Picture Vocabulary Test, Wide Range Achievement Tests - Revised, and a mental status examination. The test results revealed that plaintiff was self-conscious, exhibited low to average IQ (77), and reported being irritable, having poor appetite, a history of crying spells, sleep disturbance, feelings of guilt and worthlessness, mood swings, periods of racing thoughts, garrulousness [being wordy and talkative], and a decreased need for sleep. Dr. Lawson noted that she could be verbally aggressive, she sucked her thumb, and she had poor judgment.

Dr. Lawson diagnosed plaintiff with bipolar disorder II[11],

---

[11]Bipolar II disorder is characterized by one or more depressive episodes accompanied by at least one hypomanic episode. Hypomanic episodes have symptoms similar to manic episodes but are less severe, but must be clearly different from a person's non-depressed mood.

13

andbulimia nervosa[12], in partial remission.  She was assigned a GAF of 55[13].  Dr. Lawson noted that plaintiff was childlike in her level of psychological development in that she was deficient in mood and impulse control.  She is developmentally arrested at an earlier stage of childhood, had an extremely poor self image, and was prone to regression, negative thinking, periodic grandiosity, and acting out.  Her frustration tolerance was very low.  Dr. Lawson recommended that plaintiff undergo comprehensive mental health services including individual therapy.

---

[12]The diagnostic criteria for bulimia nervosa are:
A.  Recurrent episodes of binge eating. An episode of binge eating is characterized by both of the following:  1. eating, in a discrete period of time (e.g., within any 2-hour period), an amount of food that is definitely larger than most people would eat during a similar period of time and under similar circumstances; 2. a sense of lack of control over eating during the episode (e.g., a feeling that one cannot stop eating or control what or how much one is eating)
B. Recurrent inappropriate compensatory behavior in order to prevent weight gain, such as self-induced vomiting; misuse of laxatives, diuretics, enemas, or other medications; fasting; or excessive exercise.
C. The binge eating and inappropriate compensatory behaviors both occur, on average, at least twice a week for 3 months.
D. Self-evaluation is unduly influenced by body shape and weight.
E. The disturbance does not occur exclusively during episodes of Anorexia Nervosa.

[13]A GAF of 55 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

***Alastair Haddow, M.D.***   On May 21, 2002, plaintiff started

treatment with Alastair Haddow, M.D. (Tr. at 180-182).  Plaintiff's family

noted that she was a "zombie" on her prescribed mixture of Depakote

and Celexa.  Plaintiff noted substantial fluctuations in her mood.  Dr.

Haddow prescribed Neurontin and diagnosed plaintiff with bipolar

disorder.

When plaintiff returned on September 24, 2002, she noted that she

had done well on the Neurontin, but she felt tired (Tr. at 181).  Only a

few months later, plaintiff returned and noted that she had felt poorly in

regards to her bipolar disorder.  Dr. Haddow again increased her

prescription of Neurontin and noted that he completed disability papers

based on her current illness (Tr. at 180).

On February 5, 2003, Dr. Haddow completed a brief questionnaire

sent by Disability Determinations (Tr. at 184).  Dr. Haddow reported that

plaintiff seemed to be doing better, and she might be able to perform

some low stress part-time occupation.

On March 19, 2003, Dr. Haddow opined that plaintiff was

markedly limited in her ability to understand and remember detailed

instructions, the ability to carry out detailed instructions, the ability to

maintain attention and concentration for extended periods, the ability to

complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. at 204-205). He also provided a narrative statement in support of his opinion. He noted that plaintiff suffers from bipolar disease which has made it impossible for her to be gainfully employed. Dr. Haddow opined that adjustment of medication might prove beneficial in the future to stabilize her condition, but she should still be considered disabled (Tr. at 206).

Plaintiff returned on May 16, 2003 (Tr. at 213). She noted that she was still depressed. Dr. Haddow discussed a relationship that she was having with a girl friend that was more physical than her family would accept. She noted several abusive relationships with males, including her stepfather who sexually abused her and threatened her. She reported that she was more comfortable with a female relationship. Dr. Haddow noted the possibility of prescribing Lithium and ordered a blood test to aid him in determining whether plaintiff's dose of Neurontin should be increased.

Plaintiff returned a few days later, on May 22, 2003 (Tr. at 212). Dr. Haddow reported that the small scratches that he confronted her with on the previous visit were actually a self injury. He noted that plaintiff had become progressively more depressed and had some vomiting. Dr. Haddow advised plaintiff's family to take her to the Marian

Center for evaluation. Because there were no beds, plaintiff was taken to the Highborn Unit for evaluation. Dr. Haddow diagnosed plaintiff with bipolar disease with depression and a self injury attempt. Plaintiff was started on Lithium[14] as Lithobid-SR. On June 12, 2003, plaintiff's dose of Lithobid was increased.

Plaintiff returned to see Dr. Haddow on August 14, 2003 (Tr. at 211). She noted that her level of depression was doing better, but she had a significant number of headaches on a daily basis. Dr. Haddow reported significant temporomandibular joint tenderness and temporal fascial tenderness. She was diagnosed with acute temporomandibular joint dysfunction[15] and bipolar disease.

When plaintiff returned on November 24, 2003, she reported that she could be pregnant (Tr. at 208-209). Dr. Haddow discontinued her Lithium in case of pregnancy and recommended only Neurontin. Plaintiff

---

[14]Lithium is used to treat manic episodes of manic-depressive illness such as hyperactivity, rushed speech, poor judgment, reduced need for sleep, aggression, and anger.

[15]The temporomandibular joint is the joint where the mandible (the lower jaw) joins the temporal bone of the skull, immediately in front of the ear on each side of the head. TMJ syndrome involves the facial muscles near this joint. The muscles with which the person chews are mainly affected. People with TMJ suffer muscle spasms related to psychological stress. In some, the condition is further aggravated by tension-relieving habits such as clenching or grinding the teeth.

returned with reports of headaches on December 20, 2003. She noted that she suffered from headaches in the late afternoon and occasionally the first thing in the morning when she woke up. Plaintiff noted that she clenched her jaws during the daytime. Dr. Haddow diagnosed plaintiff with TMJ syndrome and tension headaches. She was given Flexeril [a muscle relaxer] and was told to take Ibuprofen on a regular basis.

**Burrell Behavioral Health, Suzanne McKenna, Ph.D.** On April 17, 2003, plaintiff reported to Burrell Behavioral Health for an initial assessment with Suzanne McKenna, Ph.D. (Tr. at 234). Plaintiff noted that she had been depressed since 1996 and the depression worsened in 2001. She noted that she was still depressed and did not like her last therapist because he made her talk about abuse. Plaintiff noted that she had gone four days without sleeping. She was diagnosed with bipolar disorder by history and assigned a GAF of 62[16].

Plaintiff returned on May 29, 2003, and reported that she was at the hospital for cutting herself and escalation of eating disorder symptoms (Tr. at 230). During the session, Dr. McKenna counseled

---

[16]A GAF of 62 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

18

plaintiff on control and how to deal with her sexual orientation.

Plaintiff returned a month later on June 26, 2003 (Tr. at 229). She reported that she had be more depressed lately. Dr. McKenna noted plaintiff's need to be dependent on other people. Plaintiff reported that she has two alternate personalities. She noted that she was in fairly constant conflict with these two personalities.

On July 29, 2003, plaintiff returned and asked to have her friend attend the session (Tr. at 227). Dr. McKenna noted that plaintiff became less talkative and more dependent when another person was in the room. Dr. McKenna advised plaintiff on ways to get through her friend's vacation without becoming self-destructive.

On August 15, 2003, plaintiff called Burrell Behavioral Health with threats of harm to herself (Tr. at 225). The three-minute phone call was noted as an acute psychiatric crisis.

Plaintiff reported on September 5, 2003, that she had broken off her relationship with her friend after meeting another man (Tr. at 224). Dr. McKenna discussed plaintiff's tendency to become dependent and to behave less emotionally healthy in relationships. Plaintiff returned on September 26, 2003, with her boy friend (Tr. at 221). Dr. McKenna discussed communication skills with plaintiff and noted that plaintiff seemed sad.

19

Plaintiff returned on January 6, 2004 (Tr. at 216). During the session, Dr. McKenna discussed ways that plaintiff could deal with her anger and her tendency to act out impulsively by throwing things or hurting her cats.

On February 3, 2004, Dr. McKenna completed a Medical Source Statement - Mental (Tr. at 236-237). She reported that plaintiff was markedly limited in her ability to remember locations and work-like procedures; the ability to understand and remember very short instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work related decisions; the ability to ask simple questions or request assistance; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting. Dr. McKenna also reported that plaintiff was extremely limited in her ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a constant pace

20

without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to travel in unfamiliar places or use public transportation.

   ***St. John's Regional Medical Center - Hawthorne Center***.  On May 18, 2003, plaintiff was admitted to the Hawthorne Center after expressing thoughts of suicide (Tr. at 242).  Plaintiff reported cutting herself to get back at her grandmother.  Dr. Klontz noted that plaintiff was vague on the circumstances of the injury (Tr. at 242).  Dr. Klontz noted that plaintiff thought she was doing pretty well.  Dr. Klontz's opinion was that plaintiff's IQ was probably above average and that she appeared somewhat dysphoric[17].  Dr. Klontz diagnosed plaintiff with bipolar disorder, adjustment disorder with disturbance of conduct and impulse control disorder, not otherwise specified.  Dr. Klontz assigned plaintiff a GAF of 35-40[18] (Tr. at 243).

---

   [17]General dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort.

   [18]A GAF of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

Case 6:04-cv-03510-REL   Document 15   Filed 10/28/05   Page 21 of 37

During a psychological assessment on May 20, 2003, plaintiff noted increased depression with no thoughts of suicide (Tr. at 244). Plaintiff reported making her suicidal statement out of impulse and anger (Tr. at 244). Plaintiff was discharged on May 20, 2003, with diagnoses of bipolar disorder, currently mildly dysphoric, adjustment disorder with disturbance of conduct, impulse control disorder not otherwise specified, and a GAF of 45[19] upon discharge (Tr. at 240).

**C.    *SUMMARY OF TESTIMONY***

During the April 6, 2004, hearing, plaintiff testified; her husband Chris Thompson testified; and Terri Crawford, a vocational expert, testified.

**1.    Plaintiff's testimony.**

Plaintiff was 20 years of age at the time of the administrative hearing (Tr. at 258). She graduated from high school after attending special education classes (Tr. at 258). When asked if she could read the newspaper, plaintiff said she sometimes gets the words and letters mixed up, but other than that she could "read it perfectly fine." (Tr. at 258). She cannot, however, understand an article that might appear on the

---

[19]A GAF of 45 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

22

front page of the paper, and although she reads a lot on the internet, she only understands what she reads "some of the time" (Tr. at 258-259). Plaintiff may need to read something four or five times before she understands it (Tr. at 266).

Plaintiff was 5' 5 1/2" tall and weighed 203 pounds (Tr. at 259). Plaintiff indicated she was about 50 pounds heavier than normal because of lack of energy and lack of exercise (Tr. at 259).

Plaintiff has never had a driver's license (Tr. at 260). She had a permit but did not take her driver's test because of concentration problems[20] (Tr. at 260).

When asked if she has side effects from her medication, plaintiff said she has the normal side effects but nothing too bad (Tr. at 261). When asked what the normal side effects were, plaintiff said, "Dizziness. Oh, I can't think of it. Increased appetite. That's all I can think of right now." (Tr. at 261). She also testified that she is drowsy during the day and believes that is caused by her medication (Tr. at 268).

Plaintiff suffers from a lack of concentration, she gets frustrated easily, she has very bad mood swings, and she does not know what her mood will be from one minute to the next (Tr. at 261). Plaintiff's bipolar

---

[20]In fact, in several of plaintiff's medical records, getting her driver's license was listed as a future goal for plaintiff by her treating doctors.

disorder had caused her to be very hyper lately (Tr. at 262). She "jumps down people's throats" (Tr. at 262). When she is in a manic phase, she is on edge, she does not want to be with anyone, she starts arguments with people (Tr. at 264). When she is depressed, she cries a lot, does not get out of bed, and has no energy (Tr. at 262, 263). She becomes very anxious and is afraid to be by herself (Tr. at 263). Plaintiff experiences these symptoms even with her medication (Tr. at 262). She has panic attacks which used to occur frequently but now occur only about three times per month (Tr. at 266-267). The panic attacks last all day, and plaintiff tries to clean or write poetry to take her mind off her panic (Tr. at 267).

Plaintiff has tried to commit suicide several times by cutting (Tr. at 263). She has also tried to starve herself and forces herself to throw up (Tr. at 263). Plaintiff has received treatment in the past for anorexia and for bulimia (Tr. at 264). She continues to struggle with those illnesses (Tr. at 264).

Plaintiff has headaches every day from her TMJ (Tr. at 267). The only way she can get rid of her headaches is sleeping (Tr. at 268). Plaintiff takes ibuprofen and Flexeril for her headaches but it does not really help (Tr. at 268).

Plaintiff experiences abdominal pain that she has had checked out but her doctors do not know what causes it (Tr. at 269). She gets the pain when she is stressed, like when she has to be by herself when her husband is at work (Tr. at 269).

When asked what plaintiff does during a typical day, she said she eats her meals, feeds her cats, takes her medicine, watches television, reads poetry, and colors in her coloring books (Tr. at 270).

**2.     Testimony of Chris Thompson.**

Plaintiff and Chris Thompson got married on October 25, 2003 (Tr. at 271). He has noticed that about a half hour after plaintiff takes her Xanax, she falls asleep (Tr. at 271). When asked to give an example of plaintiff's mood swings and difficulty getting along with people, Mr. Thompson said, "Well, for example, just this morning her nervousness and edginess about being here made her – she was about to jump down my throat just because she wanted to go to McDonald's before we came here, and we didn't really have the time." (Tr. at 272). Mr. Thompson testified that plaintiff is not a people person, she gets very annoyed with people for no reason, and she has a very short attention span (Tr. at 272). She gets argumentative with people at times (Tr. at 272).

25

### 3.   Vocational expert testimony.

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge.  Ms. Crawford testified that a person who is the same age as plaintiff, has a high school education, has taken special education classes, and does not have a past work record, who would need to be in a low-stress environment with simple, repetitive instructions, and no customer services, is able to write simple root words, is able to use checkmarks and signatures and is able to perform work that does not involve more than minimal use of independent judgment or change in work settings could perform medium work as a cleaner II or a hand packer (Tr. at 275).  The vocational expert testified that the Dictionary of Occupational Titles does not address low stress or simple, repetitive-type work (Tr. at 275).

The vocational expert testified that if the person is unable to sustain attention and concentration for up to two hours at a time, there would be no competitive work (Tr. at 276).  The vocational expert testified that if a person were limited as noted by Dr. Haddow in the Medical Source Statement Mental, the person would not be able to perform any work (Tr. at 276).  The vocational expert testified that if a person were

Case 6:04-cv-03510-REL   Document 15   Filed 10/28/05   Page 26 of 37

limited as noted by Dr. McKenna in the Medical Source Statement Mental, the person would not be able to perform any work (Tr. at 276).

The vocational expert testified that a person with a GAF of either 45 or 25 could not maintain sustained employment (Tr. at 276).  She further testified that "low stress" means work that is repetitive and that does not involve judgment or decision making (Tr. at 277).  The definition is her own definition and the term could be interpreted differently by a different vocational expert (Tr. at 277).

The vocational witness testified that in both the cleaner II and hand packager jobs there would be certain minimum requirements as far as productivity and quotas expected of the employee (Tr. at 277).  The vocational expert testified that a person with a GAF of 62 would be able to sustain work (Tr. at 277).

## V.   FINDINGS OF THE ALJ

Administrative Law Judge Linda Carter issued her opinion on July 23, 2004 (Tr. at 13-20).

Step one.  The ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14).

Step two.  The ALJ found that plaintiff suffers from the following severe impairments:  bipolar disorder, adjustment disorder with disturbance of conduct, and impulse control disorder (Tr. at 16).  She

27

found plaintiff's temporomandibular joint dysfunction and bulimia nervosa not severe (Tr. at 16).

Step three.  Although plaintiff argued that her impairment meets listing 12.04, the ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 16).

Step four.  Before determining whether plaintiff could return to any past relevant work, the ALJ assessed plaintiff's credibility and found her not credible (Tr. at 17).  She then determined that plaintiff has no physical limitations, she requires a low stress work environment, can only follow simple repetitive instructions, should not be involved in customer service, can write simple rote words, can use check marks, can write and read signatures, can use independent judgment minimally, and her work setting should change only minimally (Tr. at 18).  The ALJ then determined that plaintiff has no past relevant work (Tr. at 18).

Step five.  The ALJ found that plaintiff has the residual functional capacity to be a cleaner II or a hand packer, both jobs existing in significant numbers in the economy (Tr. at 18-19).  Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

Case 6:04-cv-03510-REL   Document 15   Filed 10/28/05   Page 28 of 37

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is not supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters

29

as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.   Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant alleges that she is disabled by her mental condition. Moreover, some of the claimant's treating doctors have indicated that she has significant and debilitating mental limitations. Overall, however, the objective medical and clinical findings in this case reflect that the claimant's mental condition is relatively manageable and not disabling. . . .  [T]he claimant testified that she is able to write poetry and socialize with friends.  The claimant testified that she goes out to dinner and socializes with her friends once or twice a week.  She also indicated that her poetry tends to be a page long and takes about an hour and a half to write.  Such activities are inconsistent with the claimant's contention of complete disability. . . .

> The claimant's assertion of complete disability is further undermined by the claimant's sporadic work history with low earnings.  Such circumstances are not indicative of an individual with strong motivation to work.  Considering all these factors together, the undersigned finds that the claimant is not fully credible in this case.  The claimant is limited mentally, but these limitations are not as severe or debilitating as alleged.

(Tr. at 17).

### 1. PRIOR WORK RECORD

This first factor is relied on by the ALJ in discrediting plaintiff: "The claimant's assertion of complete disability is further undermined by the claimant's sporadic work history with low earnings." At the time of the ALJ's decision, plaintiff was 20 years old, having recently graduated from high school after having attended special education classes. I cannot imagine what kind of work record the ALJ would expect a credible 20-year-old claimant to have.

Plaintiff has been struggling with severe mental illness since she was a high school student. By the time plaintiff testified before the ALJ, she really had had no opportunity to establish any type of significant work history.

The ALJ erred in relying on plaintiff's lack of work history in finding plaintiff not credible.

### 2. DAILY ACTIVITIES

The ALJ noted that plaintiff writes poetry and goes out with her friends. These daily activities are not inconsistent with disability.

Plaintiff told Richard Christy, M.D., that "it is easy for me to cry and write a poem." (Tr. at 136). Ward Lawson, Ph.D., recommended that plaintiff try to broaden her social life (Tr. at 170). The daily activities relied upon by the ALJ are actually, according to the medical records,

31

plaintiff's way of expressing her depression, and a goal set by her treating psychologist.

The ALJ failed to acknowledge that one of plaintiff's daily activities is coloring in her coloring books. This type of activity is consistent with the medical records which find that plaintiff is mentally at the level of a 12-year-old.

### 3.   DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff testified that she is depressed, in a manic phase, or having panic attacks pretty much all the time. Her medical records support her testimony. Plaintiff was given GAF scores of 25, 25, 25, 55, 62, 35 to 40, and 45. Her symptoms of depression or mania were present in all of her medical records, which were frequent and regular. Her treating physicians found that she suffers from marked limitations. The ALJ failed to discuss this factor in her opinion, and I find that this factor supports a finding that plaintiff's testimony is credible.

### 4.   PRECIPITATING AND AGGRAVATING FACTORS

The ALJ failed to discuss this factor in her credibility analysis. Plaintiff reported that dealing with problems made her symptoms worse, that dealing with specific quotas or deadlines increased her stress and caused her to become agitated and angry. Her husband corroborated this testimony. Plaintiff's medical records reflect plaintiff's dependence

32

on others, her inability to handle situations when she encounters any changes, etc.  The medical records support her testimony.

**5.     *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

Plaintiff testified that her medication makes her dizzy and drowsy. Her family told Dr. Haddow that plaintiff is a "zombie" on her medication. Her husband testified that plaintiff falls asleep about a half an hour after taking her Xanax.  Plaintiff testified that she continues to experience the symptoms of bipolar disorder despite taking her medication.  Plaintiff's medical records do not reflect that her medication controlled her symptoms.  This factor supports a finding that plaintiff's testimony is credible.

**6.     *FUNCTIONAL RESTRICTIONS***

Both of the treating physicians who completed medical source statements found that plaintiff suffers from marked restrictions.  Dr. McKenna found that plaintiff is markedly limited in her ability to remember locations and work-like procedures; the ability to understand and remember very short instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make

simple work related decisions; the ability to ask simple questions or request assistance; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting. Dr. Haddow found that plaintiff was markedly limited in her ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. There is nothing in the record contradicting these opinions.

**B.    CREDIBILITY CONCLUSION**

Based on all of the above, I find that the ALJ erred in finding plaintiff's testimony not credible.

**VII.  PLAINTIFF'S TREATING PSYCHOLOGIST**

Plaintiff argues that the ALJ erred in failing to give controlling weight to plaintiff's treating psychologist, Dr. McKenna.

The ALJ gave "little weight" to the Medical Source Statement - Mental provided by Dr. McKenna because Dr. McKenna assessed

plaintiff's GAF at 62, indicating only mild mental symptoms, and she provided no rationale for her conclusions.

Dr. McKenna assessed plaintiff's GAF at 62 only on plaintiff's initial meeting with Dr. McKenna on April 17, 2003. The Medical Source Statement was completed on February 3, 2004, after Dr. McKenna had spent the previous ten months regularly treating plaintiff. Dr. McKenna's treatment notes reflect that plaintiff dealt with severe mental problems throughout that time including a hospitalization, control issues, sexual orientation issues, increased depression, increased dependence, multiple personality issues, and anger and abuse issues. Dr. McKenna's opinion in February 2004 is based on her treatment of plaintiff over nearly a year, and her GAF assessment on April 17, 2003, is based solely on her impression of plaintiff on that very first visit.

Dr. McKenna's opinion in the discredited Medical Source Statement is consistent with the other medical evidence in the record. Plaintiff's GAF was consistently assessed much lower than the 62 relied upon by the ALJ to discredit Dr. McKenna. Plaintiff was assessed at 25, 25, 25, 55, 35 to 40, and 45. These assessments were made by Dr. Christy, Dr. Forsyth, Dr. Lawson, and Dr. Klontz. There simply are no contradictory medical records in this file, and the one GAF assessment of 62 was based on nothing but an initial encounter and is not supported

35

by anything else in the record. The ALJ improperly used that GAF assessment to discredit the opinion of Dr. McKenna in the Medical Source Statement, an opinion that is supported by the medical records of Dr. McKenna, Dr. Christy, Dr. Forsyth, Dr. Lawson, and Dr. Klontz.

## VII. CONCLUSIONS

The vocational expert testified that a person who suffered the limitations described by Dr. McKenna in her Medical Source Statement - Mental would be able to perform no work. Because I find that the ALJ erred in discounting the opinion of Dr. McKenna in that Medical Source Statement - Mental, I find that the ALJ's finding that plaintiff could perform other work is erroneous.

The substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled. Because the record establishes that the ALJ erred in failing to rely on the Medical Source Statement of Dr. McKenna, and the vocational expert testified that a person with the limitations described by Dr. McKenna would be able to perform no work, the ALJ's opinion must be reversed. There is no need, therefore, to discuss the other issues raised by plaintiff in her brief.

Based on the above, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 28, 2005